365 So.2d 381 (1978)
Arthur F. GOODE, III, Appellant,
v.
STATE of Florida, Appellee.
No. 51480.
Supreme Court of Florida.
September 7, 1978.
Rehearing Denied January 15, 1979.
Jack O. Johnson, Public Defender, and W.C. McLain, Asst. Public Defender, Bartow, for appellant.
Robert L. Shevin, Atty. Gen., and C. Marie King, Asst. Atty. Gen., Tampa, for appellee.
ADKINS, Justice.
This is a direct appeal from a judgment adjudging defendant guilty of murder in the first degree and a sentence of death.
On the morning of March 5th, 1976, a ten year old child, whom we shall refer to as "Jason", waited for a school bus with other children near his home. A young man, identified by the children as defendant, approached them and began a conversation. Defendant eventually left the bus stop with Jason and walked into a wooded area. A search began when Jason failed to return from school. The next day Jason's nude and beaten body, almost concealed under palmetto fronds, was found in the woods near Jason's home. Jason suffered an anal sexual assault before his death.
The defendant went to Maryland where he had previously escaped from a mental hospital. In Maryland, he kidnapped two *382 young boys and killed one of them in Virginia. Defendant admitted to the survivor that he had murdered Jason. He was tried in Virginia and convicted of murder, receiving a life sentence.
Defendant gave a statement in which he demanded his return to Florida so that he could be convicted of Jason's murder and be executed. Upon his return to Florida, defendant gave a full confession to the state attorney. At his trial he again gave a detailed confession and expressed a desire to be convicted and executed.
Prior to the trial defendant was represented by privately retained counsel. A motion suggesting insanity was filed and heard by the court. Four psychiatrists testified. All of them agreed that defendant suffered from a mental disorder but only one concluded he was incompetent to stand trial or assist in his defense.
The latter psychiatrist, Dr. George W. Barnard, gave the following testimony, in part:
"In summary, Mr. Goode to me shows signs of schizophrenia of the latent type with disturbance in his thoughts, in his thinking, in his affect and his behavior. In addition, I think that he meets the criteria as I understand them related to the issue of competency to stand trial in that  and I think here is the misleading part  he can give factual information and he does so very readily, and I think that this is deceiving to people in that he appears to make sense about what he is saying, but  and I think this is a matter to be argued by you and the State and for the Judge to decide, but is it rational, and I think that is the key issue."
On the other hand, Doctors Tin Myo Than, Robert J. Wald, and Mordecai Haber were of the opinion that defendant was competent to stand trial and assist in his defense.
Dr. Than's testimony contains the following:
"In summary, this young man that I have examined is not psychotic and he understands to a reasonable degree the nature of the charges, the functions of the officers of the Court and the possible outcome of such a trial. Therefore, it is my medical opinion that the Defendant is competent to stand trial, capable of making decisions in his own best interest and also to assist counsel in the preparation of this case."
Dr. Wald's testimony contains the following:
"... Mr. Goode is an individual who is, in contrast to the opinion of the first psychiatrist who testified, a nonpsychotic individual. He is making a choice based upon nonpsychotic reasons, and his reasoning basically consists of his feeling that he has already been convicted of a murder, Number One. Number Two, he wishes not to spend the rest of his life in prison. Number Three, despite his insistence that he feels no remorse he does indicate that he still considers himself to be dangerous and in a very vague way, but in a very true way indicates that somewhere within himself there is the thought that he should not be allowed to continue to go on in his present course which includes mental illness, which includes murdering young children.
.....
Q If I explained to him the McNaghten Rule in detail  are you familiar with that rule?
A Yes.
Q Could he comprehend and understand what I'm saying?
A Yes, sir, he could.
Q Would he comprehend and understand the significance of the rule?
A I believe he would, and I believe he could.
Q If I explained to him trial tactics, his right to remain silent, for instance, the right of defense of insanity, how it's presented, how it could be used, both tactically and factually, could he understand and appreciate what I as the Judge or a lawyer were telling him?
A He could understand and appreciate all of that information, and in my *383 clinical evaluation I made an attempt to talk with him about other alleged offenses and he fully understands the scope of this current investigation and possible trial. He fully understands exactly what he is accused of, what the penalties are. He stressed the wish not to incriminate himself in other areas. He has a, I would say in a nonpsychiatric term, a fairly wily understanding of what is going on."
The testimony of Dr. Haber contains the following:
"... he is not suffering from a mental disorder to the extent that he cannot assist his counsel in the preparation of his case and not to the extent that he cannot make rational decisions in his own best interest."
After this hearing, but before trial, the defendant discharged his privately retained counsel and asserted his right to represent himself. The court then interrogated the defendant:
"THE COURT: Define for me first degree murder. What are the elements in Florida?
THE DEFENDANT: First degree murder is when you plan to kill the person.
THE COURT: What is the voir dire examination of jurors?
THE DEFENDANT: The what? Pardon me?
THE COURT: What is the voir dire examination of jurors?
THE DEFENDANT: I don't understand.
THE COURT: Very well. Tell me, Mr. Goode, what is the purpose of opening and closing argument in a jury trial?
THE DEFENDANT: To get the Court to understand everything.
THE COURT: Who has the order of burden of proof in a criminal trial?
THE DEFENDANT: I don't understand.
THE COURT: What is the method of presentation of testimony in a criminal trial?
THE DEFENDANT: I don't understand.
THE COURT: Then you need a lawyer to explain these things to you.
THE DEFENDANT: But the point is, I do not want to have a lawyer, to have that take place, as far as representing me at the trial, especially a lawyer like Mr. Smith, who has not been truthful with me whatsoever at all."
The court then discharged the privately retained counsel and relieved him of all further responsibility except to fully advise and assist court appointed counsel in turning over the evidence, files, information, theories of defense and anything else that would be of assistance to the court appointed counsel.
Defendant says that every criminal defendant has the right to the assistance of counsel or the right to represent himself. However, a mixture of partially appearing for himself and partially being represented by counsel is not a constitutional right and was error.
Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), held that the Sixth Amendment to the United States Constitution required states to afford the accused the right of self-representation. Florida has historically recognized the right of a defendant in a criminal case to represent himself. See Deeb v. State, 131 Fla. 362, 179 So. 894 (1937); State v. Capetta, 216 So.2d 749 (Fla. 1968); Cook v. State, 167 So.2d 793 (Fla. 1st DCA 1964).
The record in this case adequately shows that the defendant Goode knowingly waived his right to counsel. The court fully informed the accused of the perils of self-representation. In Faretta v. California, the U.S. Supreme Court vacated a judgment of the state court because defendant was not allowed to represent himself. The opinion contains the following:
"... Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that `he knows what he is doing and his choice is made with eyes open.' Adams v. United States ex rel. McCann, 317 U.S., [269] at 279, 63 S.Ct. [236] at 241 ...

*384 Here, weeks before trial, Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will. The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, and that Faretta would be required to follow all the `ground rules' of trial procedure. We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire. For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself." Faretta v. California, supra, at 835, 95 S.Ct. at 2541 (footnotes omitted).
Defendant Goode unequivocally declared that he wanted to represent himself. The record shows that he was literate, competent, and understanding. He was voluntarily exercising his informed free will even though the judge warned him that it was a mistake not to accept representation. Nevertheless, in an effort to further protect his rights, the court furnished counsel for the purpose of giving legal advice when needed. Defendant did not object to this form of self-representation with the assistance of appointed counsel. The record clearly reflects that defendant was allowed self-representation and the record does not reflect that counsel was forced upon an unwilling defendant. In fact, defendant knowingly consented to the appearance of counsel and, in fact, sought legal advice from him during the course of the trial.
During his testimony at trial, defendant admitted his guilt. A verdict of guilty was returned. At the sentence hearing, the psychiatrists, Dr. Than, Dr. Wald and Dr. Haber again testified as to the general mental condition of the defendant. Their previous testimony had been before the judge and related to the competency of defendant at the time of trial. The defendant also testified and stated that the deceased went with him voluntarily. He stated "I am extremely proud of myself knowing that I" murdered the victim "for the fun of it, so to say". `Also, I had absolutely no remorse whatsoever" toward the victim.
The jury recommended the death sentence despite their being instructed to consider defendant's mental state as a mitigating circumstance.
Even though defendant admits his guilt and even though he expressed a desire to be executed, this Court must, nevertheless, examine the record to be sure that the imposition of the death sentence complies with all of the standards set by the Constitution, the Legislature and the courts. The questions raised by the attorney to assist defendant on appeal have been considered and are without merit.
The request of the defendant to dismiss the appeal is denied. The Legislature has imposed a duty upon this Court to examine every case in which the death sentence is imposed. Section 921.141(4), Florida Statutes (1975).
In Alford v. State, 307 So.2d 433 (Fla. 1975), the body of the thirteen year old female victim was discovered lying on a trash pile. She had been raped, both vaginally and rectally, was blindfolded, and shot five or six times. The defendant, a 27 year old male, had no significant record of prior criminal activity. The death sentence was held appropriate.
In the case sub judice, the victim was ten years old. The defendant Goode was 22 years of age. The defendant's description of the manner in which death was inflicted proved beyond doubt that the crime was unnecessarily tortuous to the victim. Both the jury and the judge considered the question of whether the mental capacity of the defendant was "substantially impaired" so that he could not appreciate the criminality of his conduct or conform his conduct to the requirements of law. Section 921.141(5)(f), Florida Statutes (1975). Comparing the aggravating and mitigating circumstances with those shown in other capital cases and *385 weighing the evidence in the case sub judice, our judgment is that death is the proper sentence.
We have carefully reviewed the evidence and procedure to determine whether the interest of justice requires a new trial. No reversible error is made to appear and the evidence does not reveal that the ends of justice require that a new trial be awarded. The judgment and sentence of the trial court in this cause is in accordance with the justice of this cause. Accordingly, the judgment and sentence of the circuit court are hereby affirmed.
It is so ordered.
ENGLAND, C.J., and BOYD, OVERTON, SUNDBERG and HATCHETT, JJ., concur.